Good morning, Your Honor. My name is Steve Marinburg, and I represent the appellants, the Universal Music Group of Companies, or as we refer to ourselves in our briefs, UMG. At the outset, I'd like to reserve five minutes of my time for rebuttal. You have to keep track of your time. This is an important case of first impression concerning the proper interpretation of the D.A.C.E. Copyright Act. That Act was designed to strike a balance between the interests of copyright owners, such as my clients, and Internet service providers. But a series of rulings by the Court below have completely upended that balance. If the District Court's orders are not reversed, the consequences will be severe to many who seek to lawfully profit from the growth of the Internet. And this is not merely a case between content holders or owners and Internet service providers. Not only will content owners like UMG and its artists and composers and producers and other content holders be severely prejudiced, but lawful Internet-based services, such as Apple's iTunes or Hulu or Netflix, to name just a few, who strive to operate lawfully over the Internet, will be placed at a competitive disadvantage with operators like Veo, who do not. No legitimate Internet service can compete with operators like Veo, who stream and download purloined copyrighted works such as movies or television shows or hear music videos for free. In addition... UNDER THE COPY... DMCA, if that's going on, you can register a complaint and put the burden on the provider to stop. Well, as a practical matter, no. That's just insufficient. Take UMG, for example, and what it faces. There are a multiplicity of sites throughout the world on the Internet, and they're all dynamic. You're talking about practicality. It's completely impractical. Okay, but we're jumping ahead. You're starting with policy. I understand that. The district court invoked it. But as with the immediately preceding case, as Judge Berzon pointed out, what we've got to deal with is what Congress wrote, okay? So you may say it's impractical. I'm sure they're going to come along and have different take. What we're wrestling with is, as the district court did, trying to reconcile the language. And so we'd have, I think, in the names going out of the 10 case, the... The fun case? Perfect 10. Oh, perfect 10. The fun case, I think, where we talked about on the takedown concept where you have to go out. My recollection is we interpreted, in the context of that case, the notion that the burden is on the copyright holder to enforce. Okay, so that's why I'm asking the question. That goes to knowledge and the like. Well, I think, Your Honor, you need to look at the perfect 10 versus C.C. Bill case in context. What was before the court there was the question of whether an Internet service provider was obliged to piece together, from various inadequate copyright notices, the information that would give it knowledge. And in that very limited context, without considering cases like this one, Judge Smith's opinion says, yes, the onus is on the copyright owner in that case. And that's fair because the Act sets out specific requirements, what a copyright owner is supposed to do in that case, when it sees that, when it can do that. But I think that that language, which the district court took out of C.C. Bill, has been stretched way too far in the context of this case. Well, what you're kind of arguing in general rather than in any subject. I assume we're now talking about the safe harbor and we're talking about the C.C. safe harbor. We're talking about what about it? What are we talking about? All right. Well, let me give you a ---- since we're talking about the language of the statute, let me make a couple of points. Is that what we're talking about? Is that what you're talking about in general? Well, I think Judge Fischer was referring to a passage from Judge Milan's opinion in C.C. Bill. Which essentially said we put the onus on the copyright owner. But if you look at the language of the Act ---- As to the ---- As to the content of, I believe in that case, Judge Smith's opinion was saying as to the content of what constitutes a sufficient takedown notice. Okay. Is that what you're talking about? What constitutes a sufficient takedown notice? Are you talking about whether this is under C at all because it's by reason of storage? What are you talking about? I have several things. I don't believe it's under C at all. I think if you look at the language ---- Why don't we go through that, okay, instead of some overview, which isn't helpful. Let's look at the language of subsection C and what was going on here. Subsection C is limited to infringement by reason of storage at the direction of a user. Now, the activities that we've accused Veo of infringement on are not storage. In fact, they've never made a serious argument, nor could they. That activities ---- Nor did the district court. I mean, the district court ---- Correct. ----accepted, in fact, he said. But this has not limited the storage. It's by reason of storage. Correct. So the district court departs from the literal language of the statute in an effort to ---- Well, he doesn't think he's doing that. He thinks he's ---- that by reason of is also in the statute. Well, but if you look at cases that have construed the by reason of language. This is by reason of is a term that's used many times by Congress in statutes. It's causation of some kind. It's not causation of some kind. If you look at, for example, the Holmes v. S.I.C. Pacific case, the court specifically says it's proximate causation. Let me give you a posit. I mean, see, my understanding is that the way this Veo system works or worked was two different ways. One was they stored things and with some transformation of it, but not really, I mean, not substantively. And you could access it through a regular browser. So it was just sitting there. You could get it. Or they had their own software. The first one, it seems to me, is by reason of storage. And the second one maybe isn't. No, neither one is by reason of storage. And let's take one of the things that you could do either from their client software or from their website. And that is hit a button on the screen that says download now. And their site would create chunks of this. It would create a copy of the video and send it to you over the Internet. So even though the initial video or file that was uploaded by a user way back when was stored in their site, when it came to downloading, that wasn't storage. It has nothing to do with storage. Likewise, when they're talking about streaming video. But in that theory, what would the C ever apply to? I mean, presumably what it meant to apply to was a server on which people could store a website and then you could go through a browser and you'd get to the website. So why isn't this the same thing? Well, storage applies to a very narrow thing. What Congress was trying to do in the DMCA, and what this Court has recognized, for example, in Ellison v. Robinson, was to codify the result, which it found satisfying from the Netcom case. And Netcom was dealing with two things. It was dealing with storage via bulletin board, not the website itself, but in a sense the backshop operations of the Internet, and transmission. And in the DMCA, essentially what Congress does, it says there's four functions that are essentially backshop or infrastructure operations of the Internet, which we do not want to impose copyright liability on because storing things in computers requires making a copy. And that's transmission, caching, storage, and linking. And in the statute, Congress set out a broad definition of Internet service providers because it had only four discrete, narrow categories of conduct that it was immunizing. And here, if you use the district court's broad construction of bi-reasonable, the but-for causation, not only do you violate the rules of statutory construction, which the Supreme Court has set forth and Holmes and other courts have, but you eviscerate the distinctions between these four discrete categories of immunized activity. One of the consequences of construing storage as broadly as the district court does is an Internet service provider who is transmitting in a way that might not meet the qualifications of subsection A because they are attaching advertisements to transmissions would, because it's stored, fall within the scope of subsection 512C under the district court's broad interpretation. Now, Congress has given us... MS. NISBET. Are there any appellate cases on this question? MR. NEUMANN. There are no appellate cases on this question. Congress, however, did tell us what they thought storage was, and it's consistent with the limited tasks that they were taking on in the aftermath of NetCount. Congress says to us that examples of such storage include providing server space for a user's website or a chat room or other forum in which material may be posted at the direction of the user. They are not talking about the storage function being the website itself, like Veo here, when people know what's on their website, but the infrastructure provider, such as Verizon, which would not know, or in NetCom, NetCom, which did not know what was on that bulletin board and could not do so, and we wouldn't want to provide, we wouldn't want to impose copyright liability on them for that. MS. NISBET. Now, suppose we thought the safe harvest didn't apply. We'd still, as I understand it, you'd still lose under the district court opinion because he ultimately found there was no copyright violation. MR. NEUMANN. No, that's not true. In fact, well, the court never reached that issue, although if you look at the attorney's fees provision, he does say it's clear that infringement is going on here. I think that actually the fight here is over whether the safe harbor applies because there's no real question in this instance that Veo is both a direct infringer and a contributory infringer, nor should there be any question that the shelter defendants are contributory infringers, not tertiary but traditional secondary liability infringers. Veo makes copies. When it streams, it publicly performs. When it permits downloads, it distributes. All are violations, direct first-person violations of UMG's exclusive rights under Section 106 of the Copyright Act. There's no real question here but that Veo is a direct infringer. MR. NEUMANN. Okay. Let's move down. We've now got over the threshold as to whether or not to store it. We have your argument there. I'm interested in the interplay between the knowledge aspect, which is what C.C. Bill was talking about, and not directly in this context, I understand, but nonetheless says that there is the notion that we're not going to impose on the provider. It's up to the copyright holder to police. And now, if one then goes to the financial benefit portion, once you, finding my place here, subsection Big B, does not receive a financial benefit directly attributable to the infringing activity in a case which the service provider has the right and ability to control such activity, why doesn't the same concept of putting the burden on the copyright holder transfer over to a right and ability to control on the notion that if you, presumably, you would have, if you have the right and ability to control, then you don't need to reach the policing function because you'd be swallowed up by the next one. MR. NEUMANN. Well, several reasons, Your Honor. First of all, C.C. Bill, in the language that you're referring to, was talking about an obligation that the DMCA itself imposes on the copyright owner, and that is the obligations under 512C3 to come up with a compliant takedown notice. When we talk about the provision that you're talking about, which is does the website get a direct financial benefit and does it have the right and ability to control, the DMCA is talking about the obligations of the Internet service provider, not the copyright owner. And so there's no connection between those two. Now, the interesting thing about the district court's opinion when it talks about C.C. Bill is that it relies heavily on C.C. Bill in the language you pointed to when it comes to the knowledge element and completely runs away from C.C. Bill when it comes to Section 512C1 capital B. HENRY FRIENDLY. It keeps running into this kind of inconsistent tension. On one hand, you give it to the ISB, and then on the next section, you take it away. Well, in the DMCA, in Section C1B, Congress made clear that what they were trying to do was keep the law of vicarious liability as it had been developing under the common law. And that's why they used the exact same language. And Rossi tells us, Rossi v. MPA tells us when Congress does that, they mean to do that, and they meant to incorporate concepts of vicarious liability. And, in fact, the House report says just that. And, in fact, in C.C. Bill, this Court said just that, albeit directed towards the direct financial benefit component, but the House report says it as to both. And it's just in C.C. Bill, one was dealing with the direct financial benefit, but there's no – you can't rely on the House report for direct financial benefit and then say the next sentence in the House report doesn't also govern. This Court recognized in C.C. Bill what Congress said, and it recognized by the language of the statute that vicarious liability principles apply here. And if vicarious liability principles apply, this Court has addressed what the test is in Napster. And it basically says, and it makes complete sense when you think about it, that if you're going to serve up ads with these free videos that your users have given you, if you're going to try to profit from this activity, then there's a heightened standard, and you need to police your site to the extent you can, to the maximum extent you can. So now you're getting down to what is the tension I'm seeing in this evolution here, is that if you read it that way, with the financial benefit, I mean, that's the way these providers make their money. It's always going to be tied. So you're always going to, it seems to me, have the financial benefit side satisfied. And if you have the, if that's the case, and in response, under the prior section, in response to a complaint from a copyright holder, you can, in fact, go in and remove the offending material, then you automatically must have the right and ability to control it. So be read your way is going to, and I think this is what was troubling the district court, if you read it this way, basically there's no, you may think it's gone too far in the direction of protecting them. Yours is going to go and basically eliminate the safe harbor altogether. No, it doesn't. And it basically, just basically, it would essentially be vicarious liability. Well, it is vicarious liability. Congress has said it's vicarious liability, not only by using the same language, but they said it. But why isn't the right and control language informed by the rest of the safe harbor language, such that the right and ability to control has to take into account the fact that exercising the obligation that the safe harbor places on you can't be the right and ability to control? Well, what I'm saying is if you decide not to have a direct financial ability, you may have less of a burden in terms of the right. Unless you're going to read this whole thing as basically only applying to people who aren't trying to make money. If you're trying to make money, then if the fact that you can take it down because pursuant to the requirements of the safe harbor, this one and also of sub I, means that you have the right and ability to control, then you have kind of blown the whole thing up. Well, I don't believe so. I think Congress was just saying, look, if you're making money, you've got to do it lawfully. You can't, you've got, you can, you can see it. But the answer to what just Fisher said and what I said has to be yes, right? You're essentially saying if you're making money, then the fact that you only take it off when someone follows the right strictures isn't good enough. Correct. If you have the ability to do it. And you have to have the ability to do it or the whole safe harbor won't apply to you at all. Well, perhaps there are instances in which you don't have the ability to do it. You haven't reserved the right to take it down, but that's not here. Does the ability have any practicality notion in it? I mean, i.e., we don't have the ability because there are 16 gazillion things here. And unless somebody tells us what's infringing, we can't do it. I think it has. Well, I think it has a practicality aspect to it, but it's not coextensive with unless someone tells us specifically we can't do it. In other words, here, without being told specifically by UMG or any other copyright owner, they had the ability to do it. Let me give you an example. When it came to stuff that they believed their advertisers didn't like, like pornography, like gay themed videos, like violent videos, they had the ability to human screen these things. And there were a lot of videos there. It was a decision they made, an editorial judgment that they made not to. Likewise, from the day they started, from the day they started, they could have used digital fingerprinting software that their competitors used. And their competitors who licensed this software will be at a disadvantage to these people if this district court opinion stands. So it's not the right and ability to control, and this is where one of the flaws in the district court's opinion, is not coextensive with being told under a takedown notice specifically. They could have stopped this. And in fact, once they ran the fingerprinting software over their system, which they didn't because they were trying to be willfully ignorant, it took them nine months to run this filter over the existing base of videos on their servers. There were 60,000 videos that were caught by this filter, involving thousands of our copyrights. And... Can I ask one other question? And I think you're out of time, but have you proven the financial benefit? My understanding is the financial benefit has to be, as it says, directly attributable to the infringing activities, so the fact that they are having ads isn't good enough. It has to be you're having ads and you're essentially capitalizing on the infringement in some direct fashion. Well, actually it goes the other way. It's even broader than that. It's does the infringing activity act as a draw to the site? That's Sonovisa, that's Napster. But in point of fact, given the procedural context that we have here, the judge never ruled that we didn't have sufficient, that we had, remember we're on summary judgment here. The judge never ruled below. Either that you did or didn't. He just said, I don't have to deal with that. I find that... But we could look at the record and... And it's in there in spades, I mean, that they derived a direct financial benefit. Not only was it a draw from the user... But, I mean, one of the things that mystified me is that the legislative history had the examples, for example, of flat rate charges, but so they seem to have a very direct notion of what it meant to be, for the infringement to be a draw, because obviously if the infringement was attractive, you presumably would have more flat rate users, and that didn't seem to be good enough for them. No, when they were talking about a flat rate, they were talking about, for example, if Netcom charged a website a flat rate for hosting services. And it didn't matter. It was agnostic as to what content was on the website. That would be a flat rate. But didn't AOL at one point used to charge for what now gives away for free? At the time that this legislation existed, regular e-mail, Internet usage? Yes, Your Honor, but what I'm saying is that... Was that the context, though? I'm just saying, is that... That's not what we... That was a flat rate kind of... The context of the flat rate was a rate that is agnostic. It's sort of a monthly rate that's agnostic to the content that's on the system. Yes, and people are more likely to pay that flat rate if they like the content. Well... And if you assume that it's infringement that they like, then they are more likely to pay for it. No, it's different. If I'm Verizon or Service, a web hosting service, I am charging Veo $50 a month, and I'm just making this up, the number up, $50 a month, and it doesn't matter what they've got on their service. If I'm Veo, and I am... One of the things that I'm doing if I'm Veo is I'm trying to create value to my website, and the metric, the key metric in the Internet world is how many eyeballs or users do you have? And so the more infringing content, which is the popular content on the site, the more eyeballs you draw. That's a direct financial benefit. Likewise, here, there's a direct financial benefit because they get incremental revenues every time a video is shown, either by showing ads on the site, some of which are targeted to the video, or by wrapping the video in ads. And so the more infringing content, and the more that infringing content is played, the more revenue they get, and that's a direct financial benefit. And likewise, for the shelter defendants... I don't think we need to let anybody on the argument. Why don't you just send them a bill like the consumer gets, and they'll probably just turn around and pay it and not even try to figure out what it is because they can't understand it. That's one way to make money. Well, we're in the content business, not the billing business. Well, that may be a good way to do it. No charge for the advice. No charge for the advice. But it's copyrighted. You can't copyright an idea. I know that. May it please the Court. My name is Michael Elkin. I'm a member of Winston & Strawn, and I represent VEO Networks. We have 20 minutes to cover three appeals. With the Court's permission, I would take the main appeal for 12 minutes. Mr. Lane would represent VEO in the fee appeal for three minutes, and Mr. Vidal and Mr. Kulik would represent the investor defendants for five minutes if we have time. I want to cover, if I may, my reason of storage, the right and the ability to control and knowledge. But before I do so, I just would like to start or key off on one of the points that Mr. Marienberg made that was the subject of some discussion, which was, I think he said, that the purpose of the DMCA was to sort of codify this decision, Judge White's decision in Netcom. What was really going on was that you did have Judge White's decision in Netcom, but you also had the Middle District of Florida's Playboy Enterprises versus FRENA, which basically had an online service provider held liable for copyright infringement for passive Internet connecting. What you had, essentially, were a wide divergence of decisions, and I would submit that the purpose of the DMCA, as the panel knows, was to facilitate the robust development of e-commerce, education, and information in the digital age. And I would also submit that but for the safe harbor provisions in the DMCA, we never would have seen investments from such companies as Facebook and Amazon and eBay and Google. I think the record reflects that Veo was the kind of player that Congress had in mind when it created the DMCA safe harbor. It had robust takedown and repeat infringer policies. It implemented filtering, not simply the audible magic filtering that Mr. Marienberg mentioned, but from the very beginning, hash filtering, and the hash filtering, what he neglects to say, cut out some 66,000 videos, which was more than the 60,000 videos that audible magic caught in this filter. The hash filtering was basically a reproduction of when there had been a complaint. That's correct, of course, absolutely. And then finally, Veo has been cooperative with the industry generally and then the content owner specifically with respect to keeping unauthorized material off of its website. UMG has been unhappy with the DMCA despite the obvious benefits. It never provided Veo with any DMCA takedown notice, and it wasn't until more than a year into the lawsuit that it finally identified specifically infringing, allegedly infringing videos, at which point most of it was taken down, within a day or two after receiving that kind of a notice. We think that the lower court decision was well grounded in the law, supported by the statute, legislative history, and the seven cases that have actually directly decided Section 512C cases that relates to the kinds of activities we're talking here. Could you focus in on, because of the time, just be sure you focus in on this interplay between precarious liability on the financial benefits side that C.C. Bill did seem to embrace, and that concept, why that wouldn't extend to the second prong of that, which is the control prong. And I think that's the tension that the district court felt, too. I'll go right to that, Judge Fischer. I appreciate that. The DMCA, with respect to the right and the ability to control, is not the common law standard. As it relates to the right and the ability to control, the C.C. Bill did not get into that part of the issue. And why is that? That is because we have a section in the statute which undercuts that. It's called Section 512M. And under that section, the online service provider has no duty to investigate FATs and has no duty to do any monitoring. It absolutely undercuts any of the issues that are raised, for example, in the other cases that the other side cited, Grokster and Napster, which were non-DMCA cases and which were addressing the common law statute. So you have a specific provision. Napster wasn't a DMCA case because it was pre-DMCA. What about Grokster? Napster actually, if I may say, was actually decided after the DMCA was enacted by a few years. But it was a non-DMCA case. Grokster also was a non-DMCA. Just because it wasn't raised? Or there was nothing that would have applied? It was. Napster actually had raised, but Judge Patel at an earlier point basically said it didn't qualify for reasons that aren't particularly pertinent. The only reason I'm curious is because I'm trying to get some sense, and as someone who doesn't know the statute that well, whether the — and you should go back to Judge Fischer's question, but maybe you should come to mine, which is whether the coverage of the safe harbors is narrow or broad essentially, i.e., there are four safe harbors. Do they cover the universe of this world, or are they really very incremental? But go back to Judge Fischer's question first. Well, I won't forget yours. Okay. So with respect to the financial benefit, first of all, you don't even get, Judge Fischer, as you know, to financial benefit until there's been a finding that the service providers had the right and the ability to control. There's no evidence in the record that VO could control the infringing activity, and as you pointed out in response to some of the comments made by my colleague on the other side of the aisle, Henderson, Ebay, Corbis, and Ellison all stand for the proposition that you can't be penalized because you're doing essentially what the law requires. On the financial benefit side, again, while we don't necessarily get there, I believe there is a causal relationship. This Court, as Judge Pragerson knows, at Harlan, actually said that there has to be a causal relationship, and there's no evidence in the record that VO went out to try to charge for infringing activity. It spent millions and millions of dollars to try to keep unauthorized material off of its site. And, Judge Burson, in response to your question, what I would say is as follows. You have, under Section 512C, there's protection to the service provider by infringing activity. You presume there's infringing activity that occurs by reason of storage. Right. But there are three other sections, too. Right. And we're only focused here on Section 512C, so I'm confining my discussion, if I may, to that. We never have said that we are involved. Somehow it's caching, which is the second section, or information tools, the fourth section, or network access. We're only talking about Section 512C, which is infringing activity which occurs by reason of storage. And all of the things that they allege, whether it's reformatting or to stream or what have you, it's all done to permit access. The statute presupposes that material that's posted at the direction of the user is going to be enabled by the service provider to provide access. There are three references to it in the statute, 512C1A3, 512C1C, and 512C3A3. All three of those sections discuss access, and it's not limited to mere storage. That's why I asked the question whether there might be a distinction between the two ways that VO operates, because it seems that when your function, and I don't know that this is satisfying, but I just wonder if technically speaking in terms of the statute, and so that by reason of doesn't take over the world, there isn't a distinction between storing, even storing with transformation in a way that it can be downloaded better, but then relying on ordinary browsers and systems to get the material down, and creating your own system for what's essentially distribution. In other words, I'm wondering whether you can say that a distribution system, you're storing, but you're also creating a distribution system, as I understand it. And it's hard for me to say why that is by reason of storage. We do have cases, and by the way, there is a circuit court that has addressed this. It's the Fourth Circuit and COSTAR. But there are six cases which have been decided other than this one where you have activity other than by storing. I understand that, but we're starting from scratch, and I want to know why it makes sense. If you're using the term or put it another way, what's the stopping point? At what point does a company or a system that stores and then does other things to get it to, between the storage and the ultimate user, to make that step or that transfer possible, not become covered by C? I think where the service provider is doing its role by permitting users to provide access, it's providing the salutary purpose that Congress had in mind to enable the public to enjoy the fruits of gaining education, information, entertainment, and what have you. I think where it stops is where this Court held in C.C. Bill where one of the actual parties was doing more than that. They were engaged in payment systems and all kinds of things, so I think that clearly there are limits. But what you have is in IO and YouTube, you have streaming, downloading, reformatting, the same as what you have here. COSTAR and Corbis, you had display of photographs. In eBay and Henderson, you had distributing, copyrighted works. Those were all activities that went beyond mere storage. In the Senate report, the passages that we cited in our brief envisaged that third parties are going to post or perform audio and visual works. There are arguments with regard to the fact that it's limited to web hosting. There's no support for it in the statute. If you take a look at section 512K1B, the definition of an online service provider is a provider of online services. It's not in the legislative history, and it's not in any of the six cases that I mentioned. I was going to move quickly, if I could, to the knowledge, the red flags issue. There, again, I commend the panel to take a look at the record. There is nothing in the record with respect to imputing knowledge of any specific allegedly infringing activity that came to the attention of VO where it did not immediately remove it once it was brought to its attention. I would submit generalized knowledge that infringing activity is up on your site has never been endorsed by any court. It was recently denounced as a concept in the Second Circuit. In the Tiffany case, it was a trademark case, but I think the policy reasons are equally availing here. Of course, in the lower courts, in the YouTube and Corpus cases, they actually recognize that as well. I would commend again to the panel the fact that we never received a DMCA notice and didn't get information about these UMG videos until a year into the lawsuit. What I would say is that Mr. Marienberg has offered a very, very narrow view of C.C. Bill. While the court's opinion began to discuss knowledge... I think we can read the cases. Okay. I appreciate that. We do have some insights to those. Congress, on the other hand, our own opinions... I'll give you a little congressional gossip later, but if I can, with respect to the red flags, I think the legislative history makes clear, as did the court in C.C. Bill, if I may, that this provision should be read narrowly. It's not a reasonable person test. The test is rather whether or not the service provider proceeded deliberately in the face of obvious signs. Don't you have three other people? Yes, I do. I'm going to take that as a hint. Thank you very much. It's a takedown order. May it please the court, Thomas Lane from the law firm of Winston and Strong speaking on behalf of the fee appeal. I know my three minutes have almost already elapsed, but let me get straight to it. Judge Fischer, with respect to Congress, there's another issue here. The court's confronted with a mandatory rule, Rule 68, and how that interacts with the discretionary Section 505 Copyright Act. And the issue to the court here is whether or not a prevailing party, which Judge Matt Spahn repeatedly in his decision, can be denied fees and costs under Rule 68. And dealing briefly with the precedent that the slides covered below, as well as the two Supreme Court cases that I think are important here. First of all, this Court has held in the Liberty Mutual case that Rule 68 is, in fact, mandatory. And it leaves no discretion for the district court in the award of costs. The courts also have rulings with respect to the Trident case as well as Champion. And I don't think, actually, the precise question that is for the court here today was presented in either the Trident or the Champion case. In Merrick, we learned from Justice Berger that if there's the underlying fee statute, fees can be covered in connection with a case like this. But Justice Berger did not say that all of the components of an underlying analysis of a discretionary award of fees must be covered and determined by the district court. All the courts said in the Merrick case, all the Supreme Court said, was that they must be properly awardable. And if we look at Section 505, 505 simply says that the prevailing party may recover fees. Justice Matz did not get into an analysis that determined that VIA was not a prevailing party. And that's why I think both the Trident case and the Champion case are distinguishable here. With respect to Trident, as the court knows, it was a clean air act case. And there is a specific requirement under the statute in Trident that in any case, cause of action brought by the administrator under the subsection, fees would not be available if the court finds that the action was unreasonable. There is no such unreasonable language in Section 505. It merely says that VIA need be determined a prevailing party, which it was here. And when the court considered a similar issue in the Champion case, the court made clear that it was not able to award fees because the defendant was not the prevailing party. In this case, you've got a startup company that was faced with years of litigation brought on by the largest record company in the world and was determined not only by Judge Matz, but also by Magistrate Judge Lloyd, to have complied with the provisions of the safe harbor. And I think in a situation here where VIO clearly walked through the Rule 68 process and did so in good faith, made a Rule 68 offer of $100,000 and was met with a response which was, well, that doesn't have enough zeros. This is exactly the type of case where fees should be awarded under Rule 68. VIO was determined to be the prevailing party. Well, under the Merrick case, Judge, Justice Berger held that you look to the underlying statute. And if there's an underlying statute that allows for fee shifting, and in copyright cases there is, it would be Section 505. Then under Rule 68, the prevailing party can receive both its attorney's fees as well as costs. That's what Merrick stood for. I thought Merrick was a copyright case and it dealt with, well, maybe I'm confused. No, Merrick was a civil rights case, and they analyzed the civil rights statute in that situation. There hasn't actually been any reported copyright case where a prevailing party defendant was denied its fees and costs under Rule 68. So the Court, I think, is met with a question of first impression as it relates to that. Because the Trident case, which this Court had before, was a clear Clean Air Act case, and the Champion case was a contract case that was applying a law from the state of Idaho. And I think at the end of the day, looking at who these parties were, looking at the Supreme Court precedent in Merrick, looking at what this Court itself has said about Rule 68 in Liberty Mutual, and looking at how the ---- But was Merrick a prevailing defendant case? I'm sorry? Was Merrick a prevailing ---- a case in which the defendant won flat out? I believe ---- It wasn't. No, it wasn't. It wasn't. No. What about the Delta case, which was such a ---- The Delta case, Justice Stevens in the Delta case merely said that in the application of Rule 68, there has to be a judgment in favor of the offeree. Right. It's based on the simple language of the statute. Right. And, in fact, in this case, there was a judgment in favor of the offeree. Separate and apart from the safe harbor decision, there was injunctive relief that was granted to UMG. So there is, in fact, an offer that would satisfy Justice Stevens' test in the Delta case. And I think, Your Honor, in light of this precedent, in light of the fact that Veo was actually found to be the prevailing party here, and Judge Matz said not in a de minimis way, this is a case that is perfect for the application and the provision of fees in addition to costs under Rule 68. And I'll note that Judge Matz didn't actually address the concept of costs under Rule 68. My time is up, and I'll leave you, Mr. McConnell. Thank you very much. Thank you. Good morning, Your Honor. My name is Robert Bedell. I'm a partner with the law firm of WilmerHale, and I represent one of the investor defendants in the underlying case, an investor defendant called Shelter Capital. Throughout this case, at the court below and in the briefing in this court, UMG has acted as if its claims against the investor, against Shelter Capital, were classic secondary liability claims, and they are not. Almost all the secondary liability cases, except Burleson, which I'll get to in a minute, are cases where some player, some actor, a netcom, a NAFSTR, a Grokster, an AOL, was actually involved in some way in assisting a direct infringer. Usually that direct infringer was a user or a consumer, but one of those entities supplied a device, software, a facility, that allowed the direct infringer to engage in that infringement. This case advances, pushes the envelope on secondary liability to an investor. Shelter Capital is not an internet service provider. It is not netcom. It is not AOL. It is not NAFSTR. It is not an internet service provider. It's an independent venture capital company. And as such, to put secondary liability, to apply secondary liability cases, this situation would be pushing the law well beyond any place in the norm before. The second thing I would say quickly is that perhaps the best proof of that fact, that this is pushing the envelope, is that UMG and Mr. Marienberg did it here again today by calling all the investors the shelter defendants. These investor defendants are three separate venture capital entities. They operate as three separate entities. They are not a collective. The fact that UMG would do two things to try to put us in a position where we might be capable of secondary liability, those two things would treat all three as if they were a single entity, which the district court found was not based on any fact. And secondly, to impute to the investors, they are the named defendants, the acts of board members of VEO. Not the acts of the investors, the acts of board members. And the district court again properly said that this would upend standard notions of corporate governance. The board members are not defendants here, could not be defendants here, because what they did was perfectly appropriate as board members. The investor entities are the defendants. And UMG is trying to impute, to push us supposedly closer to secondary liability, impute to us the acts of board members. Board members who are acting as fiduciaries to VEO. The third thing I would say is that the case that comes closest to this in any respect is the Burlesman case. And Burlesman actually is informative of exactly why Judge Matz got this right. In the Burlesman case, an investor took over the underlying infringer, mandated infringement in direct contravention of a court order that had been entered by Judge Patel to enjoin that infringement, populated the management with its own people, and then instructed that management to violate the copyright law. Burlesman was not dragged into liability by the simple act of investing. It was dragged into liability for its culpable behavior in actually doing the things that the case law says secondary liability can be imputed for. That is direct conduct that helps a direct infringer. In this case, were you to impose liability, secondary liability, were Judge Matz to have bought UMG's argument, you would have to have found that the act of investing and the act of appointing a representative to sit on an independent board would be sufficient beginning grounds for secondary liability. And there is no case that would stand for that proposition. If you have any questions, I'd be happy to answer them. Thank you. Thank you. Who's this guy now? Glenn Kulick for the other investors, Spark and Tornante. I would like to start by reading briefly from pages 2 and 3 of UMG's reply brief. Do you have anything to add in particular? Do you have anything to add? Yes. I am going to add something totally different from what you just heard. Quote, Veo, like its precursors, Napster and Grokster, is now gone, having exhausted its cash before it was able to achieve critical mass. Having spawned, nurtured, directed, and now ultimately abandoned the operations of Veo, the shelter defendants should not be permitted to walk away untroubled. Your Honors, I assure you that the investors are not going to walk away untroubled from this situation. Let's see if we understand the world according to Universal. Universal sues Veo. Veo is found not liable for copyright infringement, but Universal, who describes itself in the Second Amendment Complaint as the biggest and baddest guy on the block, forces Veo to spend all of its cash to defend itself and puts Veo out of business, thus costing the investors tens of millions of dollars, which Universal has alleged in the Second Amendment Complaint was the amount of their investment. So I assure you, having lost tens of millions of dollars, the investors are not going to be happy or walk away untroubled by the situation. But what they're troubled about is what's really happening here, and it's a policy consideration I would like you to take into account. This case is not just about piracy on the Internet. This case is just as much about the Internet itself. Counsel made the point before that Universal doesn't like the DMCA. Well, Universal also doesn't like the Internet, and the reason they don't like the Internet is it provides competition. For 50 years, companies like UMG, and there's precious few of them, had a monopoly. If you were an artist and you wanted to sell music or you wanted to sell your video, they were the only game in town. You had to play by their rules. You had to go to them. But with the advent of the Internet, now anyone, any artist, big or small, known or unknown, successful or unsuccessful, can market themselves on the Internet. They don't need Universal anymore, and that is the biggest threat, as much or more so than copyright infringement. That is the biggest threat to companies like Universal. So what happens is they end up suing a legitimate company like Veo, who has legitimate investors like my clients, and they don't sue the management of Veo. They don't sue the directors of Veo. They sue the investors of Veo for the same reason that in Perfect Ten, the plaintiffs sued the credit card companies because they know if they can shill the flow of cash to an Internet startup company, it's going to stop future competitors, and that is what is at issue here. If you look at the allegations of the Second Amendment complaint, and you forget about the hyperbole and the conclusions, and you look, as Judge Matz did, just at the facts that are alleged. For example, one of my clients, Spark, their representative is alleged to have discussed with the press the reasons why Veo removed pornographic material from Veo's site. Is that a problem? Tornante's representative, Mr. Eisner, he is accused of having received word from Disney that there was some infringing material on Veo. He passed the information on to Veo, who promptly took the material down. Isn't that what we wanted Mr. Eisner and Veo to do under those circumstances? That's the level of facts that are alleged in the Second Amendment complaint. They range from benign to noble, yet Universal tries to turn those facts on their head in order to establish something like control. The reality is we have one investor who had one seat on the board and another investor who had one seat and a third investor who had one seat and they had no control. They did what Judge Matz concluded was they were business people who did business the way business is normally conducted. Nothing more, nothing less. So I ask your honors in closing that when you deliberate, that you consider what's really going on here and the threat to suing investors such as the legitimate investors in this case and you try through your opinion to make sure that something that happened here doesn't happen in the future because if investors do not, in the absence of much, much greater factual allegations than we have here, if they're not afforded some degree of protection, this is going to be a major threat to investment in this country. So we're dealing with economic warfare, huh? Well, we are dealing with the competing considerations between commerce and, on the other hand, the copyright holders, of course. Ron, let me just briefly in reverse order deal with what we've just heard. First, Mr. Kieler. It says a lot of things about UMG and their hostility to the Internet. I would just point out to you the following people other than UMG are before this court advancing the same arguments. They include the Recording Industry of America, the National Music Publishing Association, and all of the unique... You know, Counselor, we know the parties, and I, you know, this kind of... Fine. All I'm saying is that this is not about UMG's entity to the Internet. Yeah, I understand. Okay. Let me talk about the shelter defense of UMG. That clock is kicking up. It's not, you know, you're over time. Well, I understand, but you... I'm just saying because a lot of people get confused about getting digital extensions of time. Well, Your Honor, I know that you were... We have another case behind you, so... Let me just make two or three points then that are directly responsive. One, on the Veo appeal, subsection M, which was the key, according to Veo's counsel, to unlocking that. That is a complete misunderstanding of what subsection M does. And I note that that argument was never made to the district court. This is something the district court came up with. If you look at subsection M and you place it in its proper context, it does not have anything to do with subsection C1B, the vicarious liability, or the right and ability to control. Subsection M relates to the knowledge requirement. And what subsection M says, under the rubric protection of privacy, it says, in the first instance, a Internet service provider has no obligation to monitor its Web site. But when you look at where this was found in the legislative history, it's found in the knowledge section originally. It's a subsection to the knowledge section if you go back to the original House report. But that doesn't matter very much. Well, but... With or without M, there's still the same problem, which is that the elements of notification, the whole takedown set up, would be overridden or could be overridden if you took, at least where there was a financial benefit. No, because, again, you may have the right and ability to control infringement on your Web site beyond being notified of it. They're not the same. And when it comes to subsection, just to answer Judge Fischer's question... But wait a minute. But that seems to be different than what you were saying before, because if you were just strictly applying a common law vicarious liability, wouldn't the takedown ability quite possibly be sufficient? Well, there has always been the right to say to a Web site, take something down. It used to be called the cease and desist notice. That is a separate concept of whether, under traditional vicarious liability principles, a defendant who was accused of, who was thought to be held liable under those principles, had the right and ability to control. NAFSTR had the right and ability to control. It wasn't... NAFSTR is not a DMCA case. But NAFSTR... But listen, you're eight minutes over time, you see. And we've been putting in long, long days. We've got a lot of people waiting here. And you're all good lawyers and you're all good advocates. And we've got all the materials. We've got a lot of work to do. Thank you, Your Honor. We're going to take a brief recess at this time. Thank you, Counsel. Interesting case. Well brief.
judges: Pregerson, Fisher, Berzon